IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| In re<br><br>Andrew Michael Blake,<br><br><div align="right">Debtor.</div> | Chapter 7<br><br>Case No: 2:11-bk-32854-SSC<br><br>Adversary No: 2:12-ap-00450-SSC |
| Tara Whitten,<br><br><div align="right">Plaintiff,</div><br><br>v.<br><br>Andrew Michael Blake,<br><br><div align="right">Defendant.</div> | MEMORANDUM DECISION RE: NONDISCHARGEABILITY OF A DEBT |

## I. INTRODUCTION

Tara Whitten, the Plaintiff, filed her Complaint commencing this action against the Debtor, Andrew Michael Blake, on March 5, 2012. In the Complaint, the Plaintiff asserted three claims for relief against the Debtor under 11 U.S.C.§§ 523(a)(2)(A), 523(a)(4), and

1

523(a)(6). The Debtor filed an Answer on April 12, 2012.[1] The Court conducted trial over a number of days, commencing on December 18, 2013, and concluding on February 25, 2014. At the conclusion of the trial, the Court deemed the matter under advisement.

In this Memorandum Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The issues addressed herein constitute a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334(b) and 157(b) (West 2014).

## II. FACTUAL BACKGROUND

A. <u>Overview</u>

On or about July 2006, the Plaintiff and Defendant (the "Parties") began a romantic relationship. At the beginning of the relationship, Ms. Whitten owned sole and separate real property located at 2209 W. Cherry Lynn Road, Phoenix, AZ. In the Spring of 2007, the Parties decided to move in together. In late Summer of 2007, the Parties decided to purchase a home located at 1728 E. Claremont Street in Phoenix, Arizona (the "Claremont Residence"). The Parties agreed to each contribute one-half of the down payment.

As a result of the Plaintiff's credit not being ideal, the Parties agreed that the title to the Claremont Residence would initially be in the Defendant's name to obtain the necessary financing. The Parties further agreed that Ms. Whitten's name would be added to the title shortly after the purchase of the Claremont Residence. Mr. Blake obtained a $20,000 loan from this mother in early August 2007. He utilized $3,000 of those funds to make an earnest money

---

[1] The Court conducted various pre-trial Scheduling Conferences and hearings in this matter, including oral argument on a motion for summary judgment.

2

deposit on the Residence. Mr. Blake returned a substantial portion of the $20,000 loan to his mother.[2]

On August 29, 2007, Ms. Whitten sold her sole and separate property at Cherry Lynn. She received $87,764.69 (the "Proceeds") from the sale of her property. Ms. Whitten wire transferred the Proceeds into Mr. Blake's bank account. The Proceeds were deposited into Mr. Blake's account, because the Parties had entered into a purchase contract on the Claremont Residence that required an immediate close of escrow. Mr. Blake used $84,950.26 of the Proceeds to make a down payment on the Claremont Residence on or about August 30, 2007. As a result, the Parties agreed that Mr. Blake was to pay Ms. Whitten back his portion of the down payment immediately and add her name to the title. Mr. Blake utilized the remaining $2,814.43 to make various repairs to the Claremont Residence.

The Parties continued to live together from August 2007 through August 2009. During that period, both the Plaintiff and Defendant contributed to the household/living expenses while living at the Claremont Residence with their children. The romantic relationship between the parties ended around August 2009. Ms. Whitten subsequently moved out of the Claremont Residence. Her name was never added to the title of the Claremont Residence. Subsequently, Mr. Blake did obtain a loan modification, but did not add Ms. Whitten to the title of the Claremont Residence.

Ms. Whitten sued Mr. Blake in state court in October 2009. She obtained a default judgment against Mr. Blake from the Maricopa County Superior Court, although it is not clear to the Court from the record when the default judgment was entered by the state court.

---

[2] It is unclear from the record how much Mr. Blake actually returned to his mother.

3

## B. <u>Additional Factual Findings Based Upon the Credibility of the Witnesses</u>

On December 18, 2013, Ms. Whitten, the Plaintiff, testified that she and Mr. Blake, the Defendant, had both been previously married, but developed a close relationship after a few dates. As the next step in that relationship, they decided to purchase a new home and move in together. Ms. Whitten testified that she did not have the ability to assist in the purchase of their new home unless she sold her then residence. She stated that she had no other assets available to make a down payment on the new home. What is consistent with the testimony of all parties is that she and Mr. Blake purchased a home that was more expensive than they originally anticipated.[3]

Ms. Whitten testified that because Mr. Blake made substantially more money than she did, he could obtain any financing necessary to purchase the new home. Ms. Whitten testified that Mr. Blake had good credit, "worked side jobs" to bring in extra money, was receiving income tax refunds in an amount in excess of $10,000 the year of their new home purchase, and was receiving financing from his mother to assist in the new home purchase. Mr. Blake did tell her that he might not have all of the money necessary for his share of the down payment at the time of closing on their new home.

She and Mr. Blake agreed that they would each contribute one-half of the down payment required to purchase their new home. Although Mr. Blake would initially purchase the Claremont Residence in his name and obtain the financing with his better credit score, Ms. Whitten would place all of the Proceeds received from the sale of her home in Mr. Blake's

---

[3] Their realtor, Mr. Krause, testified that part of the problem was that Ms. Whitten and Mr. Blake wanted to purchase a home with five bedrooms, a more expensive market.

4

account to assist in the new home purchase. Ms. Whitten testified that Mr. Blake further represented to her that whatever funds contributed by Ms. Whitten were not necessary for the purchase would be immediately turned over to her, that Mr. Blake would provide his one-half share of the down payment with financing from his mother, his tax refunds, and other sources within a short period of time after the closing on the Claremont Residence, and that within a week or two of the closing of escrow on their home, he would add her to the title as a one-half owner of the home.

On August 6, 2007, Mr. Blake executed a purchase contract on the Claremont Residence.[4] The purchase price was $430,000, substantially more than they had contemplated.[5] As a result, almost all of the Proceeds that Ms. Whitten received from the sale of her home, were necessary as the down payment on the Claremont Residence.[6] Thus, the Court concludes, as a matter of fact, that the parties' desire to purchase a more expensive home vitiated the ability of Mr. Blake to turn over any excess Proceeds to Ms. Whitten from the sale of her home.

Although there was an effort on cross examination to show that Ms. Whitten placed the Proceeds from the sale of her home in Mr. Blake's account as a means to defraud her creditors, the Court concludes that Ms. Whitten received approximately $30,000 a year in her employment as a nanny versus the income of Mr. Blake in excess of $70,000 per year, and that she struggled, from time to time, to repay her creditors. However, as previously discussed, Ms. Whitten placed the Proceeds in Mr. Blake's deposit account, in good faith, to comply with their agreement to purchase the Claremont Residence.

---

[4] See Exhibit 4.
[5] Ms. Whitten testified that she has previously been looking at homes in the range of $300,000 to $375,000.
[6] The sum of $84,950.26, of the total net proceeds of $87,000, was necessary for the down payment on the new house.

5

Perhaps the most persuasive evidence in support of Ms. Whitten's agreement with Mr. Blake, and Mr. Blake's fraudulent conduct with respect thereto, was the testimony of Roxann Glaim, the mother of Ms. Whitten and the accountant for Mr. Blake. First, she was present when Mr. Blake made certain representations to Ms. Whitten. Ms. Glaim credibly testified that Mr. Blake agreed to pay one-half of the down payment for the purchase of the Claremont Residence with Ms. Whitten. As the accountant for Mr. Blake, she testified that he had the ability to make such a payment if he so chose. Whereas Ms. Whitten had to sell her home to pay her share of the down payment, Ms. Glaim testified that Mr. Blake received substantial income from his regular employment in excess of $70,000 per year, that she believed he would receive $13,000 in income tax refunds once he filed his tax returns, that he received income from "side jobs,"[7] and that he was receiving some type of insurance settlement in the near future. Since Ms. Glaim prepared his income tax returns, she was well aware of his finances and his ability to pay one-half of the down payment on the purchase of the Claremont Residence with Ms. Whitten. Indeed Ms. Glaim actually completed and filed Mr. Blake's 2004, 2005, and 2006 income tax returns while Ms. Whitten and Mr. Blake were house-hunting. She testified that he would receive an aggregate refund of approximately $13,000. Perhaps most telling was Ms. Glaim's testimony that she had reviewed all of the deposits that Mr. Blake had made into his deposit account over a two-year period, and that said deposits were in excess of $230,000.[8]

Ms. Glaim further testified that there was a marked change in Mr. Blake's behavior after he and Ms. Whitten purchased the Claremont Residence. Prior to the purchase, he

---

[7] Mr. Blake advised Ms. Glaim that he received approximately $14,000 in income from "side jobs."
[8] See Exhibit 35.

6

was very warm, engaged in many family gatherings, and purchased groceries for his children and for Ms. Whitten and her family. Ms. Glaim testified that after the purchase of the Residence, Mr. Blake was only superficially friendly and became evasive or made excuses as to when he would repay Ms. Whitten.[9]

Ms. Glaim also provided critical testimony, as to a meeting she attended at which Mr. Blake and Ms. Whitten were present approximately a year after the purchase of the Residence. Mr. Blake apparently requested that meeting. Mr. Blake told Ms. Glaim that he was concerned that Ms. Whitten was not paying her share of the household expenses on the Claremont Residence. Mr. Blake presented the parties with a spreadsheet as to how much Ms. Whitten owed Mr. Blake. Ms. Glaim testified that Mr. Blake was complaining about $150 per month shortfalls of Ms. Whitten when Mr. Blake had not repaid one-half of the down payment as he had previously agreed. Ms. Glaim testified that she was surprised at Mr. Blake's proposal that he would obtain a home equity line of credit, or HELOC, secured by the Claremont Residence, that Ms. Whitten would make the payments on the HELOC loan, and that he would use the principal amount of the HELOC loan to "repay" Ms. Whitten. As Ms. Glaim concluded, Mr. Blake was requesting that Ms. Whitten encumber her one-half interest in their Residence, that she would make payments effectively on her own money, and that Mr. Blake would provide no new funding to repay Ms. Whitten. Ms. Glaim stated to Mr. Blake that such a proposal did not work, that Mr. Blake owed Ms. Whitten substantially more money than Ms. Whitten owed Mr. Blake, and that Mr. Blake should repay Ms. Whitten one-half of the down payment as he had

---

[9] Ms. Glaim testified that after the Residence purchase, Mr. Blake went so far as to place Ms. Whitten's microwave and other items on one side of the kitchen; and his items, on the other side.

7

promised. Ms. Glaim stated that Ms. Whitten would only receive her share of the down payment if Ms. Whitten had her name placed on the title of the Residence that Mr. Blake purchased with her. The Court concludes that Ms. Glaim's testimony reflects that Mr. Blake had the ability to repay Ms. Whitten his one-half share of the down payment, that Mr. Blake's conduct, as witnessed by Ms. Glaim, reflected manipulative behavior indicating fraudulent intent, and that Mr. Blake had no intention, even as of his original agreement with Ms. Whitten, to repay Ms. Whitten one-half of the down payment that he owed with respect to the purchase of the Claremont Residence.

Mr. Krause, the realtor that acted on behalf of Ms. Whitten and Mr. Blake concerning the purchase of the Residence, testified that Mr. Blake and Ms. Whitten each agreed to pay one-half of the down payment on their new home. He also stated that the parties had purchased a more expensive home than originally planned because of the need for a five-bedroom home, increasing the financial commitment of the parties as to the down payment. He advised Ms. Whitten to "make sure she was on the title of the new home." Mr. Krause also stated that Mr. Blake's behavior changed markedly after the purchase of the Residence with Ms. Whitten.

Mr. Blake's testimony was, at times, contradictory. He testified that he told Ms. Whitten he could provide no money for a down payment on their new home, yet conceded that he had income in excess of $70,000 per year, that he had a second deposit account in Oregon for work that he did in that location, that he received in excess of $10,000 in tax refunds around the time of the purchase of the Claremont Residence with Ms. Whitten, and that his mother had provided him with the sum of $20,000 to assist in making the down payment on the Claremont

8

Case 2:12-ap-00450-SSC    Doc 85    Filed 06/26/14    Entered 06/26/14 12:23:15    Desc
Main Document    Page 8 of 18

Residence purchase with Ms. Whitten. Mr. Blake did not disagree with Ms. Glaim's testimony that he had placed around $230,000 in his deposit account over a two-year period and that he had received tax refunds of $10,000 or more as a result of Ms. Glaim's preparing and filing his income tax returns. Mr. Blake did testify that he was relying on a personal injury settlement concerning a 2005 accident in which he was injured as the basis for his payment of his one-half share of the down payment. Although Ms. Glaim did testify that Mr. Blake had mentioned a settlement that he would be receiving as a potential source of repaying Ms. Whitten, Ms. Glaim focused on many sources from which Mr. Blake could draw the funds necessary to provide his share of the down payment. The Court concludes that Mr. Blake's testimony that he was relying solely or primarily on the insurance settlement to pay his share of the down payment lacked credibility.

Mr. Blake also testified that he had agreed to place Ms. Whitten on the title of the Claremont Residence purchased. His reason for not doing what he promised: "[he] just never got around to doing it." Essentially Mr. Blake took $84,950.26 from Ms. Whitten as a down payment on the Claremont Residence and gave her nothing in return. She was never repaid the sum of $84,950.26, and she never received a one-half interest in the Claremont Residence that they had purchased. Mr. Blake engaged in a pattern of behavior that fraudulently denied Ms. Whitten the ability to recover any of her money.

At trial, Mr. Krause and Mr. Blake testified that the Claremont Residence that Mr. Blake and Ms. Whitten had purchased declined in market value within six to nine months of its purchase. However, Mr. Krause testified that the Residence was worth $430,000 at the time of its purchase. If Ms. Whitten had received her one-half interest in the Claremont Residence, she

9

would have retained her interest until the housing market improved. At least she would have received something of value in exchange for the payment of her one-half share of the down payment. The Court concludes that she incurred a loss of $42,475.13 at the time of the closing on the Residence because she never received her one-half interest in the Residence.

The Court further concludes that Ms. Whitten suffered an additional loss of $42,475.13 because Mr. Blake never repaid the one-half share in the down payment that he promised. The Court concludes that Ms. Whitten suffered a loss of $84,950.26 as a result of Mr. Blake's fraudulent conduct. Ms. Whitten also requests an additional $2,814.43 concerning the repairs that Mr. Blake made to the new home when it was purchased. Ms. Whitten did not disagree that certain repairs needed to be made to their Residence. The Court has reviewed the cost of the repairs, and concludes that there is insufficient evidence to reflect that Mr. Blake's fraudulent conduct resulted in a loss to Ms. Whitten concerning the repairs to the Claremont Residence.

### III. DISCUSSION

In the Complaint, the Plaintiff asserts three claims for relief against the Defendant under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). Ms. Whitten contends that Mr. Blake falsely represented that he would pay his share of the down payment for the purchase of the Claremont Residence and add her name to the title. Furthermore, Ms. Whitten alleges that Mr. Blake misappropriated all or part of the Proceeds. Specifically, Ms. Whitten argues that the Defendant failed to return the excess Proceeds of the sale of her sole and separate property, or use the funds to assist her in paying down her debts - as agreed to by the Parties. In addition, Ms. Whitten argues that the Defendant willfully and maliciously committed the acts as set forth in

10

the Complaint and on the record, divesting her of her interest in the Claremont Residence. The Court will review each ground, seriatim, to determine whether relief should be granted.

## A. DISCHARGE OF DEBT UNDER § 523(a)(2)(A)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the extent obtained by false pretenses, a false representation, or actual fraud." In the Ninth Circuit, to prove nondischargeablity under § 523(a)(2)(A), the Plaintiff needs to show "(1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010); In re Diamond, 285 F.3d 822, 827 (9th Cir. 2002). The Plaintiff must establish the nondischargeability of a debt by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654 (1991); In re Stern, 345 F.3d 1036 (9th Cir. 2003).

For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor. In re Tsurukawa, 258 B.R. 192, 198 (9th Cir. BAP 2001). However, direct evidence of an intent to deceive is rarely shown. Hence, intent may be "inferred and established from the surrounding circumstances." In re Hutquist, 101 B.R. 180 (9th Cir. BAP 2001); In re Anastas, 94 F.3d 1280, 1285 (9th Cir. 1996); In re Dakota, 284 B.R. 711, 721 (Bankr. N.D. Cal. 2002). The court must consider whether the totality of the circumstances paints a picture of deceptive conduct by the debtor that indicates an intent to deceive the creditor. In re Basham, 106 B.R. 453, 457 (Bankr. E.D. Va. 1989). Because no single objective factor is dispositive, the assessment of intent is, thus, left to the fact-finder. In re Jacks, 266 B.R. 728, 742 (9th Cir. BAP

11

2001). The intent to defraud a creditor is a finding of fact. In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989).

The Plaintiff asserts that Mr. Blake represented that the excess proceeds from the sale of Ms. Whitten's sole and separate property would be returned to her, or used to help pay down her bills. Furthermore, the Plaintiff asserts that Mr. Blake represented that he would add Ms. Whitten's name to the title of the Claremont Residence, thus giving her equal ownership rights to the Claremont Residence. The Court finds that Mr. Blake did, in fact, make these representations to Ms. Whitten. As such, the first element has been met.

As stated in the Factual Discussion, although the Parties initially intended to purchase a residence with a value of $300,000 to $375,000, the Parties purchased the Claremont Residence that had a value of $430,000. As a result, separate from the necessary repairs that were completed, Mr. Blake utilized the balance of the Proceeds as a down payment on the Claremont Residence. As to the representation by Mr. Blake to turn over any excess Proceeds to Ms. Whitten, subsequent events altered the terms of the Parties' agreement. The Court is unable to find that this representation was false.

However, Mr. Blake knew the representations as to his payment of his one-half share in the Claremont Residence down payment and placing Ms. Whitten on the title of the Claremont Residence were false when made. The representations were made with the intent of deceiving Ms. Whitten. Without the Proceeds, the Parties would not have had the funds necessary for the down payment on the Claremont Residence. Mr. Blake obtained a $20,000 loan from his mother, but only utilized $3,000 of those funds for the earnest money deposit

12

payment – returning an unknown portion to his mother. Thus, Elements 2 and 3 have been met as to these representations.

As to Element 4, Ms. Whitten justifiably relied on the representations made by Mr. Blake. This factor is predicated on the facts and circumstances of each case. The Court must ascertain the relative sophistication of the parties and their relationship. The Court concludes that Mr. Blake was more sophisticated in financial matters than Ms. Whitten. The close relationship between the Parties, as well as Ms. Whitten's trust in Mr. Blake placed her in a vulnerable position. Given the facts in this case, the Court concludes that Ms. Whitten justifiably relied on the representations of Mr. Blake. *See* In re Kirsh, 973 F.2d 1464 (9th Cir. 1992); In re Kelly, 499 B.R. 844 (S.D.Cal 2013)(The Court must take into account the knowledge and relationship of the parties.)

Finally as to the last element, Ms. Whitten provided sufficient evidence as to the damages sustained as a result of the false representations made by Mr. Blake. As discussed previously, the Court concludes that Ms. Whitten sustained damages in the amount of $84,950.26 as a proximate result of Mr. Blake's fraudulent conduct.

Therefore, the Court must grant the Plaintiff's claim for relief under Section 523(a)(2)(A), with damages in the amount of $84,950.26.

B. DISCHARGE UNDER § 523(a)(4)

Section 523(a)(4) prevents discharge "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). In this case, the Court concludes that the parties were not in the requisite fiduciary relationship required to trigger liability under Section 523(a)(4). In Cantrell, 269 B.R. 413 (9th Cir. BAP 2001) (Fiduciary duty

13

must rise from express or technical trust imposed before, and with reference to wrongdoing that caused debt). With regard to larceny, a bankruptcy court is not bound by the state law definition of larceny but, rather, may follow federal common law, which defines larceny as a 'felonious taking of another's personal property with intent to convert it or deprive the owner of the same.' In re Ormsby, 591 F.3d 1199, 1204 (9th Cir. 2010) *citing* 4 Collier on Bankruptcy ¶ 523.10[2] (15th ed. rev. 2008). Larceny requires that the funds originally come into the defendant's hands unlawfully. In re Ghaemi, 492 B.R. 321 (Bankr. D. Colo. 2013). Here, the Proceeds were lawfully deposited by the Plaintiff into the Defendant's account. Therefore, relief under larceny is not appropriate.

The main difference between embezzlement and larceny is that with embezzlement, the defendant initially acquires the property lawfully. In re Ghaemi, 492 B.R. 321, 324 (Bankr. D. Colo. 2013). Embezzlement in the context of nondischargeability has often been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." Moore v. United States, 160 U.S. 268, 269 (1885). Thus, for nondischargeability purposes under Section 523(a)(4), embezzlement requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than for which [it] was entrusted; and (3) circumstances indicating fraud. In re Wada, 210 B.R. 572 (9th Cir. 1997); In re Littleton, 942 F.2d 551 (9th Cir. 1991); "Circumstances indicating fraud" can include situations where the debtor intended to conceal the misappropriation. In re Hatch, 465 B.R. 479 (Bankr. W.D. Mich. 2012). Embezzlement does not require the existence of a fiduciary relationship. In re Wada, 210 B.R. 572 (9th Cir. 1997).

14

The Plaintiff has set forth a sufficient basis under an embezzlement theory to be accorded relief. Ms. Whitten received $87,764.69 from the sale of her property. She then transferred the Proceeds into Mr. Blake's bank account. The Proceeds were deposited into Mr. Blake's account because the funds could not clear the Plaintiff's bank account in time for the closing on the Claremont Residence. Mr. Blake used $84,950.26 of the Proceeds to make a down payment on the Claremont Residence on or about August 30, 2007. The facts reflect that Mr. Blake agreed to pay back Ms. Whitten his portion of the down payment and add her name to the title. Mr. Blake appropriately used the Proceeds to make repairs to the Claremont Residence and to use one-half of the Proceeds as Ms. Whitten's share of the down payment. However, he misappropriated one-half of the down payment by not using the funds received from his mother, or placed in his Arizona or Oregon deposit accounts, or his tax refunds to pay his share of the down payment. Thus, he improperly used one-half of $84,950.26, or the sum of $42,475.13 to make his share of the down payment on the Claremont Residence. He misappropriated the remaining part of the Proceeds, or the sum of $42,475.13 by not granting Ms. Whiten a one-half interest in the Claremont Residence for the payment of her share of the down payment. As a result, he misappropriated the sum of $84,950.26.

As to the third prong, the circumstances of this case indicate fraud. Specifically, it is not clear to the Court why, after borrowing $20,000 from his mother, arguably to use for his portion of the down payment, Mr. Blake only utilized $3,000 of the funds to make an earnest money deposit. Mr. Blake also did not use his tax refunds or other funds he held in his deposit accounts to make his share of the down payment. Instead, he utilized Ms. Whitten's funds. In addition, the testimony indicates that Mr. Blake's demeanor changed soon after the purchase of

15

the Residence. Finally Mr. Blake made no effort to place Ms. Whitten's name on the title to the Claremont Residence as a one-half owner.

Even after he applied for a loan modification, and had the opportunity to add her name to the title – he refused to do so. Based on the foregoing facts, the Court concludes that the facts of this case illustrate circumstances indicating fraud. Accordingly, the third prong of the test has been met. The Court concludes that the Plaintiff shall have relief under Section 523(a)(4), with damages in the amount of $84,950.26.

### C. DISCHARGE UNDER § 523(a)(6)

Section 523(a)(6) prevents discharge of a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In re Ormsby, 591 F.3d 1199 (9th Cir. 2010). The malicious injury requirement is separate from the willful injury requirement. A willful injury is a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. In re Barboza, 545 F.3d 702, 706 (9th Cir.1998). The United States Supreme Court has clarified that § 523(a)(6) encompasses "only acts done with the actual intent to cause injury," as opposed to acts, done intentionally, that cause injury. Kawaauhau v. Geiger, 523 U.S. 57, 118 S. Ct. 974, 977 (1998). "[T]he subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s non-dischargeabiliy provision short of the debtor's actual knowledge that harm to the creditor was substantially certain." In re Thiara, 285 B.R. 420 (9th Cir. BAP 2002) *citing* In re Su, 259 B.R. 909, 914 (9th Cir. BAP 2001). A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse."

16

In re Barboza, 545 F.3d 702, 706 (9th Cir.1998). Tortious conduct is a required element of a §523(a)(6) claim. Lockerby v. Sierra, 535 F.3d 1038, 1040 (9th Cir. 2008).

Ms. Whitten alleges that the actions of Mr. Blake constitute a willful and malicious injury. The tort of conversion requires an act of dominion or control exerted over another's personal property that seriously interferes with the other's right to control the property. Universal Mktg. & Entm't, Inc. v. Bank One of Ariz., 203 Ariz. 266, 268, ¶ 6, 53 P .3d 191, 193 (App.2002) (citing Restatement (Second) of Torts § 222A(1) (1965); Focal Point, Inc. v. U–Haul Co. of Ariz., 155 Ariz. 318, 319, 746 P.2d 488, 489 (App.1986). This tort would apply to a debtor who wrongfully obtains possession of another's property. In this case, Mr. Blake's possession of the Proceeds was not necessarily wrongful. However, Section 523(a)(6) should certainly include a wrongful act such as embezzlement. Such conduct is the equivalent of some form of "tortious conduct." Mr. Blake's actions were also deliberate or intentional, since he had complete control over the Proceeds and the ability to put Ms. Whitten's name on the title to the Claremont Residence. Mr. Blake's actions were malicious, since he engaged in a wrongful act (embezzlement), which caused injury to the Ms. Whitten. Therefore, the Court concludes that the Plaintiff has set forth a sufficient basis under Section 523(a)(6) to be accorded relief, with damages in the amount of $84,950.26.

## IV. CONCLUSION

Based upon the foregoing, the Court concludes that Mr. Blake shall be liable to Ms. Whitten under Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6) as a result of the fraudulent representations and embezzlement by Mr. Blake. The damages are calculated in the total sum of $84,950.26. The Court shall execute a separate order incorporating this Memorandum Decision.

The Court shall execute a separate order incorporating this Memorandum Decision.

DATED this 26th day of June, 2014.

*[signature]*

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

18